## Emig *et al.* *versus* Diehl and Wife.

76    359
22 SC ¹178

1. The deposition or testimony of a witness formerly taken in the same cause may be read in evidence on showing that he is sick and unable to attend, insane, or in such a state of senility as to have lost his memory, just as if he were dead or out of the jurisdiction.

2. On a question whether a deed, alleged to be lost or destroyed, had been executed, it was not necessary that a witness who testified that he prepared the deed in the usual form in fee simple and saw it executed, should state from memory all the words of the deed.

3. The alleged deed was a voluntary deed from a father to a daughter; it was to be presumed to have been without the power of revocation.

4. When a deed is alleged to be lost, the burden is upon the party so alleging to account for its non-production, and there must be evidence to shift the onus before the case can be submitted to the jury.

5. The evidence in such case must be such as a reasonable man might found an opinion on; not a mere *scintilla*.

6. A writ in ejectment described the premises as, " a tract of land in Jackson township, containing 185 acres or thereabouts, bounded by lands of M., J. and V." The verdict was " for the farm as it stands in the writ." *Held* to be sufficiently certain.

May — 1873. Before Read, C. J., Agnew, Sharswood, Williams and Mercur, JJ.

Error to the Court of Common Pleas of *York county :* Of May Term 1873.

This was an action of ejectment, brought April 15th 1868, by George W. Diehl and Sarah his wife, in her right, against William Moul ; the premises claimed as set out in the writ were, " a tract of land situate in Jackson township containing 185 acres of land or thereabouts ; bounded by lands of Michael B. Emig, John Eyster and Valentine Emig." On the 2d of June, the court admitted John Emig, Jr., Valentine Emig and Eli Emig, executors, &c., of John Emig, deceased, to join in the defence as landlords. Afterwards the plaintiffs, by leave of the court, filed an amended description of the land, describing it by courses and distances, and as " containing 221 acres or thereabouts."

The case was tried in December 1869, and a verdict rendered for the defendants ; the judgment on this verdict was reversed by the Supreme Court. (15 P. F. Smith 320.)

The premises were originally the property of John Emig, Sr. By his will, dated June 14th 1864, and proved March 14th 1868, he ordered them to be sold by his executors and the proceeds divided amongst his three sons, who are the above-named executors.

Sarah Diehl, one of the plaintiffs, was his daughter ; she alleged that her father had in his lifetime, about the year 1850, executed and delivered to her a deed for the premises claimed in the writ ; that she had afterwards, at his suggestion, placed it in his care for safe keeping : after his death no such deed was to be found. The question in the case was whether there had been a deed executed and delivered to Mrs. Diehl, as was alleged by the plaintiffs.

[Emig v. Diehl.]

The case was tried the second time, March 8th 1871, before Fisher, P. J.

It having been admitted that the title to the land had been in John Emig, Sr., the plaintiffs offered in evidence the deposition of Philip Smyser, taken April 30th 1868, previously to the former trial, to show the execution and delivery of the deed, &c.

The defendants objected to its admission; that it was not shown that the witness had been subpœnaed; that his absence was not accounted for; and that the witness was not competent from imbecility to testify when his deposition was taken, &c.

The plaintiffs, as laying ground for admission of the deposition, then gave evidence, that the deponent was 85 years of age; that for the previous two years his mind had become greatly weakened, his memory had failed, and generally that he would be incompetent to testify, although physically he might have been able to come into court; he was living in the borough of York, where the court was sitting.

The evidence was quite voluminous as to the deponent's mental imbecility at the time of the trial, and of his capacity at the time his deposition was taken.

The court admitted the deposition and sealed a bill of exceptions.

The deponent testified : * * *

"I knew John Emig. Sr.; he was a brother-in-law of mine. I am a scrivener, and was for many years in the habit of writing deeds and other instruments of writing for other persons. John Emig, Sr., came to me and said I should write a deed conveying a farm that he had up the Hanover road, about seven miles above York, to convey that farm to his daughter Sarah Emig. I wrote the deed. He brought with him the deeds and all the papers that were necessary to give a full description of the farm. I did write the deed and made the description of the farm according to the papers he left me. When I had it written, I brought it down and gave it to him; and I feel very sure that he took it home with him; he could read my writing, and this is a thing that occurred to me lately. Afterwards he came to me, and I think I went to his house. My first impression was that he executed it at my office. When I went to his house, there he signed it and said it was right. He then lived up this street (Main street), on the south side, a few doors from Queen street, and Sarah, his daughter, kept house for him. Sarah was not in the room when he signed the deed. I am sure that I became a subscribing witness in it.* * * There was another subscribing witness to this deed, but who it was I do not recollect. When it was done he kept the deed and all the papers, and I didn't see him deliver it to Sarah." [Here plaintiffs call upon Valentine Emig and John Emig, Jr., two executors of the will of John Emig, Sr., deceased, and also William Moul, the defendant, who are all present, and their counsel, Messrs.

[Emig v. Diehl.]

Mayer and Keesey, for the deed spoken of by this witness. Messrs. Mayer and Keesey for their clients answer that they never saw such a deed, and know nothing about it.] "I was not an acting justice of the peace at the time, but I feel quite sure that there was an acknowledgment to the deed when it was signed by Mr. Emig, but I don't remember before what officer it was taken. I have been thinking a good deal over, how long or when it was that I wrote this deed, but the result of my thinking is that it was somewhere about 1850. I don't recollect anything particular he, John Emig, said as to his intentions either at the time he brought me the papers, or when he signed the deed, except that his directions were that I should write a deed to his daughter Sarah Emig. She was then not married yet, and he afterwards signed it and said it was right. This relates to 1850, and I think she was not married then. * * * The deed was written by me, as an absolute conveyance of the land, in fee simple, * * * to Sarah Emig, and embraced both tracts, as I have stated. I wrote it that way I think. I can't say how it read. I wrote it as an absolute deed. I have no doubt of it. My impression is that John Emig, Sr., held the whole tract embraced in the deed, by two separate deeds to him. I had all the old deeds, papers, drafts and so on, and that enabled me to describe the land. * * * I mean that the deed in form was a conveyance to Sarah in fee simple." * * *

Under objection and exception the plaintiffs gave evidence by Andrew Landis, who said: " I am acquainted with the location of this farm spoken of in this suit; I called on him (Emig) to rent it from him, in the fall of 1852, at his residence, in Little York; I asked him whether the farm was for rent; he said he did not know; he said there was a talk about Moul going to quit; he could not tell whether the farm was for rent or not. I asked him why he could not tell, he said the farm was not his any more; that he had given the farm to Sarah; that if I wanted to rent it I should see her. I then asked why he had not the farm to rent; he said the farm was Sarah's; he had given her the deed for the farm. * * * This occurred in 1852." * * *

Elizabeth Zinn testified: "I was acquainted with John Emig; he was my uncle by blood; brother to my father. I was at his house when he lived in York; Sarah was there also. He said he had been down street; that Moul met him and asked him to rent the farm to him; he said he could not, it was Sarah's. Then Sarah spoke up and said, Is it not better for father to rent it to them than for me to rent it? I said, That is just according as it may be. Then the old man said, Sarah has given me all her writings, and I have put them in bank in my tin box. Mr. Emig said there had been a fire and then he had got a tin box made to put Sarah's writings in and his too. He said now he had given each

[Emig *v.* Diehl.]

of his children a place, that was all. I cannot tell, it must be
about thirteen years ago.   This is not the only time I heard Emig
say this was Sarah's farm.   After this conversation he repeated
he had given Sarah this farm."

There was other evidence from several witnesses that John Emig
had frequently said that Sarah had given him her writings, to
keep at his suggestion after the fire; that he had procured a tin
box and put them into it and put the box in the York Bank.

One of his sons testified that at an interview with him, "he said,
she gave me her notes, her writings to take care of as long as I live,
and so I will too.   Then I said, But, father, that is not the mean-
ing of it; she (Sarah) meant only as long as she remained with
you.   Then he said, I will hold them as long as I live."

There was also much testimony of declarations of John Emig
that he had given the farm to Sarah; of his refusal to rent it, &c.,
or do anything in regard to it without her consent, and of other
acts tending to show that he recognised the farm as belonging to
Sarah.

At the time of the alleged execution of the deed Sarah was un-
married and was living with her father; she married in 1858 and
left him; he afterwards lived with his sons.

The plaintiff George W. Diehl testified: "I was present at a
meeting of the family, three or four weeks after old Mr. Emig's
death—it was at John Emig, Jr.'s house. * * * After dinner we
went into a side room, and John said he would go and fetch the
box; he brought an old kind of a box with 'J. E.' on it, an old
tin box.   Valentine put the box on the piano; Sarah and I were
sitting at the end of the piano.   Valentine gave John the key of
the box.   John Emig was hunting in the box.   Michael had
walked up to the box as if he was going to put his hand in; John
put his hands around the box and said to Michael, '*Here, nobody
has anything to do with this but we.*'   Then Michael walked to
the other end of the piano; John was hunting amongst the papers,
and Valentine, who was standing before me, stepped up and pulled
out an old deed out of the papers, out of a package of papers, and
was looking at it.   I noticed George Emig's name on the ·deed,
and said it was George Emig's deed. * * * Eli came up and got
the old deed; he walked back to Michael with the old deed, and
Valentine then got another deed out of the same package; he
opened· the deed then; I was near him; Valentine was right
against me.   When he had that paper I was sitting all the time;
I was sitting when he had the deed in his hand.   Then I looked
in and saw it was a deed; John Emig to Sarah Emig.   Then
after we looked at it awhile, John said, Valentine, put these
papers away, they have all got mixed up; Valentine folded it up
and put it back again in the box; can't tell whether he put
it in the package or not.   I saw Valentine put it back in the

[Emig *v.* Diehl.]

box. \* \* \* I was present at the appraisement of the goods and chattels of John Emig, deceased, and I saw the tin box on that occasion in the room of John Emig, Jr. ; John brought it out; it was opened by John Emig, the defendant; the appraisers were there, and they looked over the papers. I did not see the same deed that was there before, and was in Valentine's hands. When the papers were all examined, I said there was one paper here I did not see; that was all; he said he did not know. I said nothing more to him about it."

On cross-examination he said: \* \* \* "John opened the box; John got the key from Valentine; the first deed was an old looking deed; the deed was an old torn deed; the deed just at the end appeared to be worn through; the deed was made from George to John Emig; it was a deed some printed and some filled up; I spoke to Valentine about that deed; he opened it and looked in it and I looked in it; the other was not altogether a new deed—nothing was torn at it; that was also a printed form filled up; I did not see the outside of it, I saw the upper half of the deed, where the deed commences; I saw the name of John Emig and at the other end of the page Sarah's name, above what I could read I read of course; I had not all the description in the deed, all that I saw was that it was a deed from John Emig to Sarah and I saw the whole line; I could read it above; I could see it half ways down, not probably half ways down ; I did not have it in my hand, if I had had I expect I would not be here now." \* \* \*

A son of John Emig testified that after his father's death he went to John Emig, Jr., one of the executors, to pay a note which he owed to Sarah, that the executor brought a tin box from his chamber and found the note in it.

Plaintiffs offered now to prove by the plaintiff Sarah Diehl that she gave her deed for the land claimed in this suit to her father for safe keeping about 1856 or thereabouts, and that he never returned it to her, and that when she got married and went away to live with her husband, she asked him for it and he said he had it in the bank in his box, and never after gave it to her.

Offered to the court for the purpose of accounting further for the non-production of the deed under which plaintiffs claim title.

The offer was allowed and was then withdrawn.

There was other evidence by the plaintiffs in support of their case.

In the course of the trial each of the executors, in answer to notices to produce the alleged deed, said on oath, that he had never seen such deed or heard John Emig, deceased, speak of such deed.

The defendants gave much evidence in answer to the plaintiffs' case; and in many instances directly contradicting the statements of plaintiffs' witnesses.

[Emig *v.* Diehl.]

Much of the evidence of the plaintiffs was received under objection and exception; it is not necessary to notice this evidence in detail.

The points of the plaintiffs and their answers were :—

1. If the jury believe that John Emig, Sr., in his lifetime, executed a voluntary deed of conveyance to his daughter Sarah Emig, for the land claimed in this suit, and delivered the said deed to her, such deed was irrevocable by the grantor and vested the title to the said lands in her from the instant of delivery; and the plaintiff is entitled to recover.

Answer: " The law as stated in this point is correctly stated."

2. If the jury believe from the evidence in this cause, that John Emig, Sr., in his lifetime, executed and delivered to his daughter Sarah Emig, a deed of conveyance for the land claimed in.this suit, and that afterwards the said deed was given to him again by his said daughter for safe keeping, and that he afterwards refused to give it up to her; or that he destroyed it; or that he kept it in his tin box till his death, and that after his death his executors destroyed or suppressed it; yet neither his own refusal to give it back to his daughter, nor the suppression. or destruction of it by himself or his executors, are of any avail to divest the title once vested in her by the delivery of the deed; and the plaintiff is entitled to recover.

[*] Answer: " If the facts are as stated in this point; the refusal of Mr. Emig to give the deed up if he did refuse to do so, nor the suppression or destruction of it by himself, or by his executors, are of any avail to divest the title if it once vested in her by the execution and delivery of a deed; if one was made and delivered."

3. If the jury believe the testimony of Philip Smyser, Esq., an actual deed of conveyance for the lands claimed in this suit, was signed and sealed by John Emig, Sr., to his daughter Sarah Emig; and, if they believe the testimony of Andrew Landis, the actual delivery of a deed therefor by the said John Emig, Sr., to the said Sarah Diehl is positively proved; and though without an actual deed of conveyance, a man's declarations are ineffectual in law to convey his lands, yet where such deed is positively proved to have been executed, the acts and declarations of the grantor contemporaneous and subsequent, are legal and competent evidence from which the jury may infer the delivery of such deed; and if they find from all the evidence in this cause, that such deed was executed and delivered by John Emig, Sr., to Sarah Emig, the plaintiff is entitled to recover, and their verdict must be for her.

Answer: " The weight of the testimony and the credibility of the witnesses are for the jury to determine. The law as stated in this point is correct and we affirm the portions of law contained in it."

[Emig *v.* Diehl.]

The defendants' points and their answers were :—

1. A plaintiff seeking to recover in ejectment upon a legal title, must produce the deed under which the land is claimed, or account for its non-production to the satisfaction of the court, the evidence on this subject not being for the consideration of the jury, and before this is done no secondary evidence can be permitted to go to the jury; the plaintiff being presumed to have the custody of her own deed, must therefore, in the first place, satisfy the court of the reason why she does not produce it. The plaintiff in this case was fully aware of her duty in this respect, as she made an offer to the court to make such proof, and when the court was ready to receive the testimony, withdrew the offer, and declined to testify on the subject; therefore the secondary evidence is not to be considered by the jury, because the primary is not produced or accounted for, and as the case stands, the verdict must be for the defendants.

2. There is nothing in the testimony of Michael Emig, or of George W. Diehl, or of any other witness in the cause, describing or identifying any such deed as alleged by plaintiffs, or tending to show that such alleged deed, being first duly executed and delivered to Sarah Emig, was in the hands of her father or of his executors; that the proof must be clear and satisfactory, and is for the consideration of the court only, of the identity of the instrument and of its possession by the opposite party, when such possession is alleged, as the reason for its non-production, before the court can receive secondary evidence of the execution and delivery of the alleged deed to be submitted to the jury; and as preliminary proof of this description is wanting in this case, for that reason the secondary evidence cannot be considered by the jury, and the verdict must be for the defendants.

3. The contents of a lost paper must be so proved that the court can say with something approximating to certainty what it contains. That in this case the farm was purchased in separate parcels from time to time; that the witness, Philip Smyser, Esq., is the only witness offered to prove the contents of the alleged deed; that he does not profess to remember its date, its consideration, or the quantity of land contained in it, except by reference to two deeds, the land contained in which he put in one, although a large portion of one of the tracts was long ago sold off by John Emig, of which he, the witness, takes no account. That he has no knowledge of the *habendum*, exceptions, reservations, conditions or other component parts of said alleged deed, but furnishes his conclusions of its legal effect, by saying that it was a deed in fee simple, and almost all he tells about it, is what he thinks and not what he recollects, besides which there are other circumstances establishing his want of memory on the subject, so that neither the plaintiffs themselves nor the court can say with any degree of

certainty what the alleged instrument contains, within the limits of the land comprised "in two deeds," and in the absence of such proof, the court cannot submit to the jury to find the execution and delivery of a paper, the contents of which cannot be proved.

Answer: "We cannot withdraw these questions from the jury. We think after the court had heard the preliminary proof, it was proper to submit the questions of execution and delivery to the jury, for their consideration and decision."

4. According to the provisions of the Acts of Assembly of Pennsylvania for the proof of lost deeds, a recovery cannot be had in an action of ejectment upon the allegation of title under a deed alleged to be lost, unless the plaintiff resort to the especial proceedings for the proof of lost deeds, and that if a plaintiff seeks to recover upon a title under such a deed, she must first establish its existence and execution under such special proceedings, and not having done so in this case, the verdict must be for the defendants.

Answer: "We will not answer this point in the affirmative. The law may be so, but we will not withdraw the facts from the jury for that reason."

5. Nothing is more common than that a father speaks of a farm, upon which he has placed a son or daughter, as the son's or daughter's farm, or of a house in which he permits a son or daughter to live as the son's or daughter's house. It is an every-day occurrence that a father speaks of having given a lot of ground to a son or daughter, when it is plain that there was no intention to transfer the ownership, and such language is not confined to parol gifts. When a father says I sold such a piece of real estate to my son or daughter, he generally means no more than that he agreed that the son or daughter might have it for a consideration; he does not necessarily mean that his own dominion over it has ceased, and that a sale has been executed. Were courts to look at the language of parents expressed to others as evidence of title in children, it would annihilate domestic confidence, and it would doubtless, in most cases, be giving an effect to loose declarations that was never intended. That for these reasons no importance is to be attached by the jury to the loose and casual expressions of John Emig, that "the farm was Sarah's," that it "belonged to Sarah," or even if he gave or appropriated a part of the income to her as her own; and no declaration or act of John Emig's would transfer the title to her and enable her to recover in this suit, except a deed duly executed and delivered to her for the farm.

Answer: "No declarations or acts of John Emig's would transfer the title to his daughter Sarah, and enable her to recover in this suit, unless a deed was duly executed and delivered to Sarah for the farm."

6. The evidence to establish a deed lost or one not produced,

[Emig *v.* Diehl.]

must be clear and satisfactory. There is no evidence in this case purporting to relate to a deed, except that of Philip Smyser, Esq., and of Andrew Landis, and nothing to connect their testimony as relating to the same paper. The credibility of the testimony of both these witnesses is impeached by evidence of contradictory statements, and by other circumstances alleged to exist in the evidence. The testimony of Philip Smyser does not purport to prove the delivery of a deed, and that of Andrew Landis purporting to be a casual declaration at an interval of years, unconnected with that of Mr. Smyser, and without force in itself to divest a legal title, adds little or nothing to Mr. Smyser's testimony. The testimony of these witnesses, taking it together, if believed, lacks that completeness and satisfactory character which the law requires in such cases. The other evidence in the cause, being of loose and casual declarations of a parent in reference to a child, is of a different species, and can add nothing to the proper evidence in such a case, and therefore upon the whole the evidence in the cause is not sufficient to authorize or sustain a verdict for the plaintiffs, and the verdict must therefore be for the defendants.

Answer : " The evidence to establish a deed lost or one not produced, must be clear and satisfactory. It cannot be established by loose and vague declarations, that the owner has given the property which it is alleged the declarations referred to. The evidence to establish a deed not produced, must satisfy the jury that it was executed and delivered, and its non-production must be accounted for. The effect of the evidence to make this proof is for the jury, and so is the credibility and truthfulness of the witnesses."

7. Upon the evidence in the cause the plaintiffs are not entitled to recover, and the verdict must therefore be for the defendants.

Answer : " Whether the evidence is sufficient to enable the plaintiff to recover is for the jury to decide in accordance with the law as given to you by the court."

The court charged:—

* * * [" This cause was tried once before, and this court believing that the offer made to prove certain facts ought not to have been received and submitted to the jury, rejected it and ordered a verdict to be rendered for the defendants. The case was afterwards taken to the Supreme Court and reversed ; that court being of opinion that the evidence ought to have been submitted to the jury for them to pass upon.] * * *

" The plaintiffs contend that about 1850 the father of Mrs. Diehl executed a deed to her for the land in dispute, and afterwards delivered it to her. Defendants contend that no such deed was executed, and if there was it was never delivered, (and as a deed executed but not delivered vests no title in the grantee) ; the

[Emig *v.* Diehl.]

deed if executed vests no title in Mrs. Diehl, and that therefore the plaintiffs cannot recover.

"The main question in this case, therefore, is, was there such a deed executed and delivered. To prove the execution of the deed, Philip Smyser, Esq.'s, deposition was taken. On account of the dilapidated state of his mind, enfeebled by old age, he cannot remember any transaction, as is testified by many witnesses, his neighbors, friends and near relations, and amongst them several medical gentlemen, who gave it as their opinion that he has not mind enough left to enable him to testify. Under these circumstances we have allowed his deposition to be read, but the jury in considering its contents will make due allowance for his old age and want of memory, and give its contents such credence as they think it deserves." * * *

The court then spoke of the deposition of Mr. Smyser and proceeded :—

[" The jury will look at all the circumstances attending Mr. Smyser's connection with it; his extreme old age; his present inability, on account of mental imbecility, to be examined as a witness; and they will decide whether such a deed was or was not executed.]

"If the jury find that no such deed was executed, then they need go no further in this case, for their verdict must be for the defendants. But should the jury find that a deed was executed by John Emig to his daughter Sarah, in such definite and precise terms as would enable the jury to say what property was conveyed, and how much it contained, or the land pointed out with such certainty that the jury can ascertain it from the evidence, then they can take another step in the case, and inquire was there a delivery of this deed. [Apart from Mr. Smyser's deposition, not a witness has been called who testifies that he ever saw such a deed, and no witness swears that he or she was present at its delivery. The only testimony that bears the semblance of proof of actual delivery of a deed, is that of *Andrew Landis.*"]

The court, after stating some of the testimony of Landis, and that of several other witnesses as to declarations of John Emig that he had given the farm to Sarah, said :—

* * * [" Any amount of testimony of declarations made by a father that he had given a farm or any other real estate to a child of itself, amounts to nothing. A man cannot talk away a house or a farm. The only use that the jury can make of such declarations, is to take them into consideration as of some weight in determining the question as to whether a deed was made or executed by John Emig, and delivered to his daughter Sarah. They are only persuasive of execution and delivery; they do not prove the fact, nor will any accumulation of such testimony suffice to prove an execution and delivery of a deed. The law will not allow the transfer

[Emig *v.* Diehl.]

of real estate by proof of the witnesses of the declarations or conversations of the parties.] A voluntary gift of real estate from a parent to a child cannot be by parol. It can only be established by the execution and delivery of a written instrument, but when the deed is lost or destroyed, the evidence to make out that it once existed must be precise and definite in its terms, so much so as to leave no doubt in the minds of the jury that a deed was executed and delivered, and any proof short of this is wholly inefficacious, and cannot be considered by the jury.

" It is said by the defendants that the act of ownership over the farm in dispute exercised by John Emig, such as having it taxed in his own name prior and since the date of the alleged deed to Sarah, and up to the time of his death ; having it insured at one time in his own name by the Conewago, Newberry, East and West Manchester Townships Mutual Fire Insurance Company, and at another time in the York County Mutual Insurance Company ; at another time commencing proceedings before the fence viewers in relation to the fences on the farm in dispute in his own name, are facts totally inconsistent with the allegation that the farm belonged to Sarah. Taking out the policy of insurance in his own name is particularly so, as in case of loss by fire, no benefit could accrue to him, or insurance be recovered, if he was not the actual owner of the premises insured. [Again on the 3d of June 1863, he leased a portion of the premises in his own name to Mr. Myers, of Lancaster county, for the purpose of mining ore on it. These facts are strong evidences of ownership. It is for the jury to say in what character he acted when he did these things ; whether he acted as owner or agent.]

" There are many instances known to us all, of parents saying that certain pieces of property belonged to certain of their children, naming them, and often putting them in possession of them. Such acts and declarations are not proof of the execution and delivery of a deed, but rather of an unexecuted intention, hereafter to make them a deed, or devise the estate to them by will. In either case, until the intention is carried into effect by the making and delivery of a deed, or execution of a will, and subsequent death of the testator, no title vests in the child.

[" In the present case, no proof has been made by Mrs. Diehl herself of the manner in which she lost or disposed of the deed. Evidence of the execution and delivery of a deed without producing or accounting for its non-production, cannot avail a party to recover in ejectment. Before the jury can find a verdict for the plaintiff, she must give some satisfactory reason to the jury why the deed was not produced. Although Sarah Emig was not a competent witness to prove the execution and delivery of the deed, she was a competent witness at least to the court to prove its loss, and the court would have instructed the jury in the absence of her

26 P. F. SMITH—24

testimony to prove its loss, that the plaintiff could not recover. If it had not been that the Supreme Court decided that it was the duty of the court to receive the evidence in relation to the tin box and the papers it contained, and of the conduct of the executors in relation to them and submit it to the jury, this court would have decided this as a matter of law; but as it is a matter of fact, then it becomes an important question, to be decided by the jury. Did the alleged deed to Sarah get into the hands of John Emig, Sr., and was destroyed by him, or taken from the tin box by all or any one of the executors? The first question the jury will decide is, was this deed ever put in the tin box by John Emig; if they should find that such deed was ever delivered to Sarah Emig."] * * *

The court referred to the testimony in relation to the deed being put into the tin box, and said :—

" Mr. Diehl describes the deed he saw with Sarah's name in as one partly printed and partly written. [The jury will decide whether the deed Mr. Diehl supposes was the one his father-in-law made to his wife, and the one found in the box was the same one, but this must be decided by the evidence. Philip Smyser says in his testimony that he wrote the deed he prepared, but that he did not write an acknowledgment. Mr. Diehl swears that the deed which he saw was partly written and partly printed. If this be so, then it cannot be the deed that Smyser wrote, if that deed was all written.]

" The question then recurs, if the deed supposed to have been written by Philip Smyser was even delivered to Sarah, John Emig, Sr., must have destroyed it in his lifetime, and thereby committed an enormous crime, or that the executors destroyed it after his death, and thereby committed a like criminal offence. The destruction of a deed is a crime and the jury cannot presume it. All men are presumed in law to be innocent of crime, and before it can be fixed upon John Emig, Sr., it must be proved by clear and satisfactory evidence, that he destroyed it. Was it destroyed by one or all of the executors? Is this proved? It is dangerous to fix upon men great crimes. unless the evidence is so clear as to establish the fact to your entire satisfaction.

" But on the other hand, if John Emig, Sr., having intended to give his daughter the farm, had a deed made, and kept it in his own possession and did not deliver it to her, but changed his mind as to the manner he would dispose of the farm, and instead of giving his daughter the deed, destroyed it, he had a perfect right so to do, and his title to the property in dispute passed to the executors under the will, and not to Sarah under an undelivered deed. That John Emig made a will is not disputed, nor that he devised the property in dispute to his executors. [Before the plaintiffs can recover, the jury must be well satisfied from the evidence, first,

[Emig v. Diehl.]

that a deed was prepared by Philip Smyser and executed by John Emig, conveying the farm in question to Sarah ; secondly, that it was delivered to Sarah, and thirdly, that Sarah gives a satisfactory account of the manner in which she became dispossessed of it, or in which it was destroyed.    If she has done these, and the property described in the plaintiff's writ is the same property mentioned in the alleged deed to her as prepared by Smyser, then the plaintiffs are entitled to your verdict, otherwise your verdict must be for the · defendants.    However much we may sympathize with Sarah on account of the small portion she has received out of her father's estate, courts and juries cannot establish deeds or wills unless the proof of them come up to the full measure required by the law. Has this been done ?    If it has not, there can be no recovery by the plaintiff, and your verdict must be for the defendants."] * * *

The jury rendered this verdict :  "We render the verdict in favor of the plaintiff for the farm as it stands in the writ."

The defendants took a writ of error ; they assigned for error :—

1–3. The answers to the plaintiffs' points.

· 4–10. The answers to the defendants' points.

11–18. The parts of the charge in brackets.

19–21. The rulings of the court on the offers of evidence.

22. That the court erred in entering judgment on the verdict on account of its uncertainty.

*V. K. Keasey* and *J. L. Mayer*, for plaintiffs in error.—The submission of the case to the jury to find, even against the opinion of the court itself, is novel and unprecedented; and is one of the assignments of error.    The plaintiffs claimed title under an alleged voluntary deed to Sarah Emig from her father, asserted to have been made nearly twenty years before bringing suit against his life-long seisin and possession, and a descent cast by his death. Without a deed, there could of course be no recovery ; and to prove its existence and contents by " clear and satisfactory evidence " was a necessity of the plaintiffs' case : Metcalf *v.* Benthuysen, 3 Comst. 428 ; Kerns *v.* Swope, 2 Watts 79 ; Flinn *v.* McGonigle, 9 W. & S. 76, 77 ; Gangwere's Estate, 2 Harris 426 ; Hale *v.* Hill, 8 Conn. 39 ; Powers *v.* Russel, 13 Pick. 69 ; Tayloe *v.* Riggs, 1 Peters 591.

Being a voluntary deed it may have contained a power of revocation which would depend essentially on its contents.    It is none the better for being voluntary, for then equity lets it *severely* alone, with just such effect, and no more, as the law allows : 1 Story Eq., § 706, *a ;* Frederick's Appeal, 2 P. F. Smith 338, 342 ; Dennison *v.* Goehring, 7 Barr 175.    Chancery entertains an equitable supervision over the validity of such a deed, based upon an implied power of revocation, unless the party setting it up can show that it was understood, and intended to be irrevocable :

[*Emig v. Diehl.*]

Story's Eq., § 706 *b;* Coutts *v.* Ackworth, Law Rep. 8 Eq. Cas. 558; Jarrett *v.* Aldam, Law Rep. 9 Eq. Cas. 463; Hall *v.* Hall, Law Rep. 14 Eq. Cas. 365.

The evidence of the execution and delivery of the deed and of. the reasons for its non-production, did not justify submitting the secondary evidence to the jury: Sharswood's Starkie 531 *n;* Jackson *v.* Frier, 16 Johns. 195; Porter *v.* Wilson, 1 Harris 641; McCredy *v.* Schuylkill Nav. Co., 3 Wharton 424, 439; Bush *v.* Hasbrouck, 12 Johns. 192.

Deeds are sometimes made and retained to operate only at the death of the grantor, in which case they are of a testamentary character, and like a will, may never take effect if the donor changes his mind: Stillwell *v.* Hubbard, 20 Wend. 44; Frederick's Appeal, 2 P. F. Smith 338; Perry *v.* Scott, 1 Id. 119; Maynard *v.* Maynard, 10 Mass. 456.

Proof of acceptance is not necessary as an essential part of proof of delivery in case of a voluntary deed, where the other requisites of complete execution and delivery exist, as the law presumes assent from the fact of its being a gift: Boardman *v.* Dean, 10 Casey 252. But on the other hand the law will not aid by its presumption a mere voluntary deed, as it will where a valuable consideration has passed and the clear intention is manifested that the title shall be transferred, the instrument being in fact voluntarily put beyond the control of the grantor: Blight *v.* Schenck, 10 Barr 285; Garnons *v.* Knight, 5 B. & C. 671; Pringle *v.* Pringle, 9 P. F. Smith 281; Thompson *v.* Lloyd, 13 Wright 127. The effect of an acknowledgment is only to dispense with proof of the *signing* and *sealing* of a deed, not with the proof of its *delivery*, and when the instrument is in possession, the delivery may of course be inferred from the fact of possession by the grantee or obligee: Rhine *v.* Robinson, 3 Casey 30; Doe d. Hammond *v.* Cooke, 6 Bing. 174; Rounsdale *v.* Grove, 4 McLean 284; Blake *v.* Davis, 20 Ohio R. 231.

The declarations of a father in regard to his property, and his child, are of no significance whatever as evidence of the transfer of title: Ackerman *v.* Fisher, 7 P. F. Smith 459; Eckert *v.* Mace, 3 Penna. R. 365; Poorman *v.* Kilgore, 2 Casey 365; Harris *v.* Richey, 6 P. F. Smith 395; Toe *v.* Toe, 3 Grant 74; Hugus *v.* Walker, 2 Jones 173.

The testimony of Landis does not identify the deed as that spoken of by Smyser, and was not such evidence of its execution and contents as is required by law: Hale *v.* Hill, 8 Conn. R. 42. The declaration of a party that he had *sold and conveyed,* imported a deed, but was no *proof* of the deed: McDonald *v.* Campbell, 2 S. & R. 473; Jackson *v.* Shearman, 6 Johns. 19. Parol declarations are inadmissible to prove or disprove title: Jackson *v.* Miller, 6 Cowen 725; Jackson *v.* Cole, 4 Id. 587; Jackson *v* Carey, 16 Johns. 302.

[Emig v. Diehl.]

*H. L. Fisher* and *W. C. Chapman*, for defendants in error.—This testimony traces all Sarah's "writings" including the deed, to the possession of John Emig, Sr., under whom the plaintiffs in error claim, and is the same in legal effect as if they had been traced into the possession of the plaintiffs in error themselves. They had notice to produce the deed and failed to do so. There was also strong evidence of spoliation. Was all this taken together sufficient to account for the non-production of the deed, and to let in secondary evidence? This proof was ample in itself, and such as could not be determined by the court alone, but was proper to go to the jury, under the instructions of the court. The admissibility of this evidence was in no way affected by the fact, that as to the spoliation, other witnesses testified differently. That was for the jury: Hamsher *v.* Kline, 7 P. F. Smith 397; Krise *v.* Neason, 16 Id. 253; Campbell *v.* Wallace, 3 Yeates 271; 1 Greenl. Ev., § 558 note 1, 560; Shortz *v.* Unangst, 3 W. & S. 55; Mauri *v.* Heffernan, 13 Johns. 58, 74; Thomas *v.* Harding, 8 Greenl. 417; Corbin *v.* Jackson, 14 Wend. 619; Flinn *v.* McGonigle, 9 W. & S. 75. If there is any evidence, however slight, tending to prove the formal execution of a deed, it is sufficient to entitle it to go to the jury; Hamsher *v.* Kline, 7 P. F. Smith 397. The deed if delivered was irrevocable: Worrall *v.* Jacob, 3 Merivale 256; Bunn *v.* Winthrop, 1 Johns. Ch. 329. As to the uncertainty of the verdict: Hagey *v.* Detweiler, 11 Casey 409; Santee *v.* Keister, 6 Binn. 36; Green *v.* Watrous, 17 S. & R. 393; Tyson *v.* Passmore, 7 Barr 273; Clement *v.* Youngman, 4 Wright 342; Smith *v.* Brotherline, 12 P. F. Smith 461; O'Keson *v.* Silverthorn, 7 W. & S. 246.

Mr. Justice SHARSWOOD delivered the opinion of the court, July 2d 1873.

Though we have no express decision upon the subject, it seems clear upon principle that the deposition or testimony of a witness formerly taken in the same cause, can be read in evidence on showing that he is sick and unable to attend, insane or in such a state of senility as to have lost his memory of the past, equally as where he is dead or out of the jurisdiction: 1 Greenl. on Ev., § 163, n.; Jack *v.* Woods, 5 Casey 375. The evidence that Philip Smyser fell within the category of loss of memory and general mental incapacity from old age, was very ample. Nor was it necessary to have him in court for examination. It would have been a painful and improper exposure, and no rule of law requires it. Besides, he would not have understood the meaning of the subpœna—would not have attended, perhaps, voluntarily—and an attachment against him for contempt would have been entirely out of the question. It was abundantly proved, that at the time the deposition was taken he was in the possession of his memory and reason. It was therefore rightly received.

[Emig *v.* Diehl.]

When this case was tried before the learned judge below on a former occasion, he rejected all the offers of testimony, and directed a verdict for the defendant. The judgment was reversed in this court: Diehl *v.* Emig, 15 P. F. Smith 320. It was decided that the testimony thus offered and rejected would have made out a case for the jury. Upon a careful examination of the evidence returned with this record, we think that these offers were made good, and we see no reason to reconsider and overrule the decision formerly made. With the weight of the evidence, we have nothing to do. The court below, if dissatisfied with the verdict on that ground, should have sent it to another jury. Two verdicts the same way would have been a good reason why the last should stand, even though against the opinion of the court. But it is a question which the law has wisely confided to the discretion of that tribunal. We cannot review it.

If the testimony of Smyser was believed, a deed was written by the witness and executed by John Emig, conveying to his daughter Sarah, in fee simple, the farm in question. It was not necessary that the witness should be able to state from memory all the words of the deed. It was in the usual form as he stated, and he might have been cross-examined as to the particular parts in detail. Until some evidence was given to the contrary, it must be presumed to have been without any power of revocation. It is true, and it is perhaps a sufficient explanation of the fact that John Emig afterwards disposed of the property by will—that it is not an uncommon vulgar error, that every voluntary deed made without consideration is revocable by the grantor. John Emig may have changed his mind as to the gift of this farm to his daughter, and as it had not been put on record, supposed that the destruction of it would accomplish his purpose. There was evidence, however, not only that such a deed had been executed, but that it had been delivered. The testimony of Andrew Landis alone of the declaration by John Emig, that " the farm was Sarah's, he had given her the deed for the farm," would have carried the case to the jury as far as that question was concerned. It was corroborated, however, by many other acts and declarations of the grantor.

Was there then sufficient evidence to account for the non-production of the deed ? Undoubtedly, in the first instance the onus was on the plaintiffs. There must be evidence to shift this onus before the judge could submit the case to the jury. It must be such too as a reasonable man might justly found an opinion upon, not a mere *scintilla.* There certainly was evidence from which, if the deed had been executed and delivered, the jury might reasonably infer that it had been handed by Sarah *to* her father for safe keeping. It is an undisputed fact that upon the occurrence of a fire in the neighborhood, John Emig procured a tin

[Emig v. Diehl.]

box to keep his papers in. Elizabeth Zinn testified: "The old man said, Sarah has given me all her writings, and I have put them in bank in my tin box. Mr. Emig said there had been a fire and then he had got a tin box made to put Sarah's writings in and his too." This was said at a time when, according to the witness, he was speaking of the farm. Michael Emig testified: "I came to father's once, after a fire had occurred in the alley; then he said he had got a tin box made for himself and put his writings in it. Then he said, Sarah gave me her writings, too, and I put them in the box and put it in the bank, so that it wouldn't burn." This was entirely natural and probable, and if her writings generally were deposited in the box, the presumption would be that her unrecorded deed for the farm, no doubt the most valuable of them, would be put there with them. This point was submitted to the jury by the learned judge, with remarks upon the presumption against the destruction of the paper either by John Emig or his executors, of which certainly the plaintiffs in error have no reason to complain. The not examining Sarah herself, though she was in court, was a circumstance to be considered by the jury.

The description of the premises in the writ was sufficiently certain within all our cases: Clement v. Youngman, 4 Wright 341; Smith v. Brotherline, 12 P. F. Smith 461.

Judgment affirmed.

Mr. Justice WILLIAMS dissented, "On the ground that the evidence does not show that the plaintiffs made any search for the alleged lost deed."